******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* LAZALE ASHBY
## (SC 18190)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

Convicted of the crimes of capital felony, murder, felony murder, sexual assault in the first degree, kidnapping in the first degree, and burglary in the first degree in connection with the stabbing and strangulation of the victim in her apartment, the defendant appealed to this court. The police arrested the defendant when his DNA profile was matched to DNA taken from the victim's vaginal swab, and, after the defendant was confronted with that evidence, he gave the police a written confession. Evidence presented at trial established that a second, unidentified male also contributed to the DNA on the victim's vaginal swab, and unidentified male DNA also was discovered on the doorframe of the victim's bedroom and in saliva found on the victim's shoulder. Prior to the defendant's trial, P, a jailhouse informant who was incarcerated with the defendant, wrote a letter to W, a detective with the Hartford Police Department, indicating that he had information about the defendant that would be useful to W and referencing an unrelated criminal case pending against the defendant. W subsequently met with P at the prison, where they discussed the defendant's involvement in the victim's death, whether P might receive a benefit for providing additional information, and whether P would be willing to wear a wire. When W did not contact P again after the meeting, P informed the defendant of the meeting, and the defendant devised a ruse intended to undermine W's credibility in anticipation of W's testimony at trial. A few days before the state was to rest its case, P contacted W and informed W of the defendant's ruse, and the state notified the defense that it intended to call P as a witness. The defendant filed a motion to suppress P's testimony, which the trial court denied, concluding that P had not been acting as an agent of the state when he elicited information from the defendant. Thereafter, the defendant requested an instruction on third-party culpability in connection with the presence of the unidentified male DNA found in and on the victim's body and at the crime scene, but the trial court declined to give that instruction. On appeal from the judgment of conviction, the defendant claimed that the state violated his sixth amendment right to counsel by using P as an agent to deliberately elicit incriminating statements from the defendant, there was insufficient evidence to support his conviction of burglary in the first degree, and the trial court improperly declined to provide a third-party culpability instruction to the jury in light of the unidentified male DNA discovered in and on the victim's body and at the crime scene. *Held*:

1. The trial court improperly denied the defendant's motion to suppress P's testimony in violation of the defendant's sixth amendment right to counsel because P was acting as an agent of the state when he deliberately elicited incriminating statements from the defendant, and, accordingly, the judgment of conviction was reversed and the case was remanded for a new trial: although there was no express or formal agreement between P and W, in light of the totality of the circumstances, P's efforts to elicit incriminating statements from the defendant were fairly attributable to the state, as the meeting between P and W emphasized what useful, incriminating information P might obtain as a result of his future assistance and specifically focused on P's efforts to obtain information from the defendant, possibly through wearing a wire or by other means, about his specific involvement in the victim's death rather than his involvement in unrelated criminal cases; moreover, P and W discussed P's interest in receiving a benefit in exchange for his cooperation, W indicated that the state's attorney would have to approve any such deal, and, after P testified at the defendant's trial, the state in fact provided P with his desired benefit by agreeing not to object to P's attempt to secure a sentence modification, which P and W had discussed during their meeting; furthermore, the psychological pressures inherent

in confinement, along with P's lengthy consecutive sentences, provided P with a strong incentive to cooperate with the state, W never directed P to cease eliciting information from the defendant or to avoid conversations with the defendant until the state's attorney had approved of P's cooperation with W, and the state either knew or should have known that W's meeting with P was likely to result in further elicitation of information from the defendant.

(*One justice concurring in part and dissenting in part*)

2. This court declined the defendant's invitation to overrule its holding in *State* v. *Allen* (216 Conn. 367), and, accordingly, the defendant could not prevail on his claim that the evidence was insufficient to establish that he remained unlawfully in the victim's apartment for purposes of his conviction of burglary in the first degree; contrary to the defendant's assertion that *Allen* improperly conflates the burglary elements of intent and unlawful remaining, that case stands for the narrow proposition that the state may prove an unlawful remaining on the premises, for purposes of first degree burglary, by proffering evidence that a defendant has engaged in conduct on the premises that was likely to terrorize the occupants, and the defendant advanced no argument that his conduct in the victim's apartment was unlikely to terrorize the victim; moreover, this court's narrow reading of *Allen* was bolstered insofar as the Appellate Court has consistently restricted its application of *Allen* to cases in which the state has presented evidence that the defendant engaged in conduct likely to terrorize occupants, and the fact that the legislative history of recent amendments to the burglary statutes strongly indicated that the legislature has acquiesced in this court's decision in *Allen* counseled strongly against overruling *Allen* in favor of a more restrictive statutory interpretation of the relevant statutory ((Rev. to 2001) §§ 53a-100 (b) and 53a-101 (a) (2)) language; furthermore, variations among jurisdictions with respect to the law of burglary and license to remain did not justify departing from the weighty considerations attendant to stare decisis.

3. The trial court abused its discretion by declining to provide a third-party culpability instruction to the jury, as the defendant established a direct connection between a third person and the charged offenses; the evidence reasonably supported an instruction on third-party culpability, as unidentified male DNA was recovered directly from the victim's body and from the blood covered doorframe of her bedroom, rather than from the periphery of the crime scene, and the DNA on the victim's shoulder would have existed only for a limited duration and was not otherwise explained by the record.

Argued April 29, 2019—officially released August 6, 2020**

*Procedural History*

Substitute information charging the defendant with three counts of the crime of kidnapping in the first degree, two counts of the crime of capital felony, and one count each of the crimes of murder, felony murder, sexual assault in the first degree, and burglary in the first degree, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Espinosa, J.*; verdict of guilty; thereafter, during the penalty phase of the proceedings, the jury found that the existence of aggravating factors outweighed the mitigating factors, and the court rendered judgment of guilty in accordance with the verdict and imposed the death penalty on each count of capital felony and terms of imprisonment on the remaining counts, from which the defendant appealed to this court; subsequently, the trial court, *Dewey, J.*, granted in part the defendant's postjudgment motion for an evidentiary hearing but denied the relief requested; thereafter, the trial court, *Baldini, J.*, resentenced the defendant on each count of felony murder to a term of life imprisonment without the possibility of release. *Reversed*; *new trial.*

*Adele V. Patterson*, senior assistant public defender, *Jennifer L. Bourn*, supervisory assistant public defender, and *Judith L. Borman*, former senior assistant public defender, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *John Fahey*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, C. J. The principal issue in this appeal is whether the state violated its affirmative obligation under *Massiah* v. *United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), and its progeny to respect and preserve an invocation of the right to counsel under the sixth amendment to the United States constitution by using a jailhouse informant, Kenneth Pladsen, Jr., to deliberately elicit certain incriminating statements from the defendant, Lazale Ashby. The defendant, who was convicted of several crimes in connection with a murder in the city of Hartford on the night of December 1, 2002, appeals[1] from the underlying judgment, raising numerous claims of error. For the reasons that follow, we conclude that the defendant's constitutional right to counsel was violated and, accordingly, that he is entitled to a new trial on all counts. With respect to the defendant's other claims, we conclude that (1) he is not entitled to a judgment of acquittal on the charge of burglary in the first degree in violation of General Statutes (Rev. to 2001) § 53a-101 (a) (2) on the ground of insufficient evidence, and (2) the trial court improperly declined to provide a third-party culpability instruction to the jury in light of certain unidentified male DNA discovered at the crime scene.[2]

The record reveals the following relevant facts and procedural history. On December 1, 2002, the victim[3] was living with her two year old daughter on the second floor of a three story apartment building located on Zion Street in Hartford. At approximately 7 p.m. that evening, Yvette Davila, who lived in an apartment on the third floor, invited the victim's daughter upstairs to watch Rudolph the Red-Nosed Reindeer on television. The victim went upstairs about one-half hour later, left her daughter with Davila, and never returned. Although Davila made several attempts to contact the victim over the hours that followed, those efforts proved unsuccessful. Davila's husband, Daniel Roman, went downstairs the following morning, noticed that a door to the victim's apartment was ajar, and stepped into the victim's kitchen. Once inside, Roman saw the victim's naked body lying on the floor of an adjacent bedroom. Roman then went back upstairs to his apartment, where he and Davila called the police at 7:17 a.m.

The evidence offered at trial indicates that the victim died as the result of strangulation. Specifically, an examination of the body revealed petechial hemorrhages and neck abrasions consistent with the use of an irregular ligature. The victim had also sustained several nonfatal injuries, including numerous stab wounds to her back. Forensic evidence did not establish an exact time of death, but the presence of rigor mortis indicated that the victim had been dead for hours by the time the paramedics arrived that morning. A significant amount of blood was found in both the kitchen and the bed-

room.

The police subsequently developed an unspecified lead and, as a result of that information, were able to obtain a warrant for a sample of the defendant's DNA to test against several samples collected from the crime scene. Those tests revealed that the defendant and an unidentified male were contributors to certain DNA profiles developed from the victim's vaginal swab. On September 3, 2003, the defendant, who was eighteen years old at the time, was arrested by the police. He waived his *Miranda*[4] rights and then was questioned at length. Although the defendant initially denied knowing or having sex with the victim, he ultimately gave a written confession after being confronted with the results of the testing that had been performed on the victim's vaginal swab.[5]

The operative information in the present case contained nine counts, including two counts of capital felony; General Statutes (Rev. to 2001) § 53a-54b (5) and (6); one count of murder; General Statutes § 53a-54a (a); one count of felony murder; General Statutes (Rev. to 2001) § 53a-54c; one count of sexual assault in the first degree; General Statutes § 53a-70 (a) (1); three counts of kidnapping in the first degree; General Statutes § 53a-92 (a) (2) (A), (B) and (C); and one count of burglary in the first degree. General Statutes (Rev. to 2001) § 53a-101 (a) (2). The defendant pleaded not guilty, and a trial commenced on May 8, 2007.[6] On June 27, 2007, a jury returned a verdict finding the defendant guilty on all counts. The trial court subsequently rendered a judgment of conviction in accordance with the jury's verdict.[7] This appeal followed. See footnote 1 of this opinion.

I

We begin with the defendant's claim that the state violated his right to counsel under the sixth amendment.[8] Pladsen, a jailhouse informant who was incarcerated with the defendant prior to and during the defendant's trial, testified that the defendant had asked him to participate in a ruse intended to undermine the credibility of Andrew Weaver, a detective with the Hartford Police Department. The defendant sought to suppress that testimony pursuant to *Massiah* v. *United States*, supra, 377 U.S. 201, and its progeny, arguing that Pladsen had deliberately elicited incriminating statements while acting as an agent of the police. On appeal, the defendant claims that the trial court incorrectly concluded that no agency relationship existed and, as a result, improperly denied his motion to suppress Pladsen's testimony pursuant to *Massiah*. In response, the state contends that the trial court's conclusion was correct, and, therefore, the defendant's motion to suppress was properly denied. We agree with the defendant.

The record reveals the following additional undis-

puted facts relating to Pladsen's involvement in the present case. On December 27, 2006, Pladsen wrote a letter to Weaver. At that time, Pladsen was an inmate at Northern Correctional Institution (Northern) in Somers and interacted with the defendant on a regular basis.[9] That letter stated, among other things, that Pladsen had information about the defendant that could prove "very useful" to Weaver, that Pladsen was scheduled to be paroled to serve a separate fifty-five year sentence in Iowa, and that Pladsen would be extradited back to Connecticut after serving that sentence. The letter referenced certain individuals involved in another criminal case that was pending against the defendant and included the following invitation: "You want my help, come [and] see me [and] we'll talk." The letter stated that Pladsen was not seeking a transfer to another correctional institution, a sentence reduction, or "anything like that."

In response to Pladsen's letter, Weaver scheduled a meeting that was held in a private office at Northern on January 5, 2007. During that meeting, Weaver and Pladsen spoke specifically about the defendant's involvement in the victim's death. Pladsen did not convey any detailed information but, instead, provided only general facts to show that "he might know something." At some point during that conversation, Weaver inquired whether Pladsen would be willing to wear a wire.[10] Pladsen initially expressed some concern but ultimately agreed. Pladsen also asked whether he would benefit in some way from providing information about the defendant.[11] Weaver said that any "deals" or plans to use a wire would have to be approved by the Office of the State's Attorney and that he would get back to Pladsen.[12] Pladsen said that he understood. Weaver then added that the police are "always interested" in gathering information about criminal matters from reliable sources and that he would be willing to listen to, and subsequently verify, anything Pladsen had to say. Weaver also made Pladsen generally aware that the defendant's trial was imminent and that the Office of the State's Attorney would be told any relevant information. Weaver then told Pladsen that, because of his criminal record and history, his word "[w]asn't going to be good enough . . . ."

The Office of the State's Attorney subsequently advised Weaver to take no further action with respect to Pladsen. As a result, Weaver did not follow up with Pladsen as Weaver had promised. Over the months that followed, a corrections officer contacted Weaver on a few occasions to let him know that Pladsen wanted to speak again. On May 17, 2007, Weaver asked a corrections officer to inform Pladsen that "nothing . . . had changed" and that Weaver would try to be in touch again soon.[13]

Pladsen testified that he eventually told the defendant

about the meeting with Weaver. Pladsen stated that the defendant had then made a plan for Pladsen to feed Weaver information about the case so that the state would call Pladsen as a witness. According to Pladsen, he was then supposed to lie on the stand and say that he had received that information from Weaver. Pladsen testified that he asked the defendant to write the information down and that the defendant had created a one page note as a result. On May 28, 2007, a few days before the state was scheduled to rest its case, Weaver received multiple telephone calls indicating that Pladsen wanted to get in touch again. Pladsen testified that Weaver called him the following day to ask what information Pladsen had. Pladsen then read Weaver the note over the telephone.[14]

The state immediately notified the defense of its intention to call Pladsen as a witness and disclosed a copy of a five page report by Weaver detailing the preceding events. On May 30, 2007, the defendant filed a motion seeking to suppress Pladsen's testimony pursuant to, inter alia, the sixth amendment. The following day, the trial court commenced an evidentiary hearing outside of the presence of the jury. During that hearing, Weaver and Pladsen testified about the nature of their conversations and the various events leading up to the creation of the note. In particular, Pladsen testified that he had acted on his own accord and that Weaver had not promised him anything.

At the close of the evidentiary hearing, the trial court orally denied the defendant's motion to suppress Pladsen's testimony.[15] In a subsequent, written memorandum of decision, the trial court concluded that Pladsen was not acting as an agent of the state. In reaching that conclusion, the trial court expressly found Pladsen's testimony to be credible. The trial court reasoned: "Testimony demonstrated that Pladsen and Weaver had no contact prior to January, 2007, and that Pladsen initiated the first contact. There is no evidence to suggest that the state, at any point, had a plan to enlist Pladsen's help in obtaining incriminating evidence from the defendant or had made an agreement with Pladsen to obtain such evidence. In fact, all [the] evidence indicates that there was no plan or agreement. Likewise, there is no evidence to suggest that . . . any . . . law enforcement agency was involved in the decision to house Pladsen near the defendant. Weaver never instructed Pladsen to obtain incriminating evidence about the defendant but, in fact, told him that any action would require prior approval by the [Office of the State's Attorney]. Weaver was advised not to pursue the matter and never initiated further contact with Pladsen. When Weaver later contacted Pladsen, it was only in response to multiple messages requesting a return call. In addition, Weaver made no promises or offers to Pladsen and told him that he had no authority to do so. Finally, the defendant continued to discuss the details of his

case with Pladsen, even after he knew that Pladsen had met with Weaver.''

After the trial court denied the defendant's motion to suppress, the following evidence was presented to the jury. Pladsen testified that he was an inmate at Northern, again recounted the defendant's ruse to discredit Weaver, and identified a particular exhibit submitted by the state as the note that the defendant had written.[16] Although Pladsen was subjected to extensive cross-examination regarding his criminal history, mental health, and possible motives, he testified that he was receiving absolutely no benefit in exchange for his testimony. The state then presented testimony from a handwriting expert, Greg Kettering, who concluded that there was "no doubt" that the note shared a common authorship with known samples of the defendant's writing. The note was then admitted into evidence as a full exhibit over the defendant's objection. The contents of that note stated, among other things, that the author had "used the bloody tank top on the floor to strangle [the victim], and that's the murder weapon."[17]

Pladsen subsequently filed a motion in the Superior Court seeking modification of a twenty-five year sentence he had received for an assault on a corrections officer.[18] The state consented to a hearing on that motion, which was held on December 23, 2016, pursuant to General Statutes § 53a-39 (b). At that hearing, the state represented that Pladsen's motion for a sentence modification "was made . . . in the spirit of what [Senior Assistant State's Attorney John] Fahey had indicated to . . . Pladsen, that [the state] would make the court aware of what [Pladsen] had done . . . ." See footnote 17 of this opinion. Although the state consented to the hearing, it took no position on whether Pladsen's motion should be granted. After listening to testimony from the corrections officer who Pladsen had assaulted, the trial court in that case denied Pladsen's motion.

On appeal, the defendant claims that the trial court improperly denied his motion to suppress Pladsen's testimony. Specifically, the defendant claims that his sixth amendment right to counsel was violated when the state used Pladsen as an agent to deliberately elicit incriminating statements. In order to obtain relief on such a claim, a defendant must prove the following: "(1) the [s]ixth [a]mendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's [counsel] being present; and (3) that agent deliberately elicit[s] incriminating statements from the defendant." (Internal quotation marks omitted.) *Henderson* v. *Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006), cert. denied, 549 U.S. 1252, 127 S. Ct. 1383, 167 L. Ed. 2d 160 (2007); see also *Massiah* v. *United States*, supra, 377 U.S. 206; *Stewart* v. *Wagner*, 836 F.3d 978, 985 (8th

Cir. 2016); *State* v. *Swinton,* 268 Conn. 781, 854, 847 A.2d 921 (2004).

The defendant's presentation of this claim, which focuses on the question of agency, turns on the following general themes: "(1) Weaver's encouragement . . . of Pladsen, (2) Pladsen's agreement to provide evidence and wear a wire, and (3) the state's failure to take any action to call off Pladsen . . . ." The defendant asserts that "[t]he trial court's and [the] state's constrained view of agency as requiring explicit instruction, or as requiring that the informant adhere to a preexisting plan . . . is unsupported . . . [by] the case law" and that the state "knew or should have known that Weaver's interaction with Pladsen created a situation likely to induce [the defendant] into unknowingly giving uncounseled, incriminating statements to a person who had agreed to help the state obtain evidence . . . ."

In response, the state argues that the trial court correctly concluded that Pladsen was not acting as an agent of the government. The state supports this argument by pointing to several of the same facts relied on by the trial court. Specifically, the state highlights (1) the absence of specific plans or instructions, (2) the fact that Pladsen appeared to be self-motivated, (3) Weaver's statement that he could not personally approve any plans or deals, and (4) the fact that Weaver never followed up with Pladsen after their initial meeting.

The state concedes, as it must, that the defendant's sixth amendment right to counsel attached well before Pladsen's involvement. See, e.g., *Kirby* v. *Illinois*, 406 U.S. 682, 689–90, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972). Likewise, the state advances no argument that Pladsen's actions fell short of deliberate elicitation. See, e.g., *Kuhlmann* v. *Wilson*, 477 U.S. 436, 459, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986). Finally, the state does not claim the absence of prejudice or otherwise invoke the harmless error doctrine. See, e.g., *United States* v. *Miller*, 116 F.3d 641, 667–69 (2d Cir. 1997), cert. denied, 524 U.S. 905, 118 S. Ct. 2063, 141 L. Ed. 2d 140 (1998), and cert. denied sub nom. *Arroyo* v. *United States*, 524 U.S. 905, 118 S. Ct. 2063, 141 L. Ed. 2d 140 (1998). Thus, the sole issue with respect to this claim on appeal is whether Pladsen was acting as an agent of the state when he elicited incriminating statements from the defendant.

"It is well settled that, [w]hen reviewing a trial court's denial of a motion to suppress, [a] finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights . . . and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are

supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Jacques*, 332 Conn. 271, 279, 210 A.3d 533 (2019); see also *State* v. *Swinton*, supra, 268 Conn. 855. "The issue of agency, even in a constitutional context, is primarily a question of fact . . . ." (Citations omitted.) *State* v. *Alexander*, 197 Conn. 180, 185, 496 A.2d 486 (1985). Nonetheless, to the extent that the resolution of that question "calls for application of the controlling legal standard to the historical facts," it "presents a . . . question of law . . . which [this court reviews] de novo."[19] (Internal quotation marks omitted.) *State* v. *Castillo*, 329 Conn. 311, 322–23, 186 A.3d 672 (2018). Such a review "is not limited to the facts the trial court actually found in its decision on the defendant's motion to suppress. Rather, [this court] may also consider undisputed facts established in the record, including the evidence presented at trial." Id., 340 (*D'Auria, J.*, dissenting). "[I]n particular, [this court] must take account of any undisputed evidence that does not support the trial court's ruling in favor of the state but that the trial court did not expressly discredit." *State* v. *Edmonds*, 323 Conn. 34, 39, 145 A.3d 861 (2016).

"[T]he United States Supreme Court has held that a state violates the sixth amendment when, acting through an undisclosed agent, it 'deliberately elicit[s]' incriminating statements from an accused 'after he [has] been indicted' and his right to counsel has attached." *State* v. *Swinton*, supra, 268 Conn. 855, quoting *Massiah* v. *United States*, supra, 377 U.S. 206. The general nature of this constitutional duty is clear: "[T]he [s]tate [has] an *affirmative obligation* to respect and preserve the accused's choice to seek [the] assistance [of counsel]." (Emphasis added.) *Maine* v. *Moulton*, 474 U.S. 159, 171, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985).[20]

Cases from the United States Supreme Court establishing this line of sixth amendment jurisprudence do not directly address the question of agency. A review of those decisions does, however, provide necessary context. In *Massiah* v. *United States*, supra, 377 U.S. 202–203, law enforcement officers installed a radio transmitter inside of a vehicle belonging to a cooperating codefendant. While the defendant in that case was free on bail, he made incriminating statements inside of the vehicle that were later admitted into evidence over his objection at trial. Id., 203. The Supreme Court concluded that these facts amounted to an indirect interrogation and that federal agents, therefore, had violated the sixth amendment.[21] Id., 206.

Like the present case, *United States* v. *Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), involves government interactions with a jailhouse informant. In that case, federal law enforcement officers contacted an inmate who previously had been paid for providing information. Id., 266, 270. That informant indicated that

he had been assigned to the same cellblock as the defendant and several other federal prisoners. Id., 266. "The [officer] told him to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or [to] question [the defendant] regarding the [crime at issue]." Id. Notwithstanding these instructions, the informant subsequently engaged the defendant in a series of conversations about the crime at issue, which caused the defendant to make certain incriminating statements. Id., 267. The informant recounted those statements at trial, and the defendant subsequently was convicted. Id. The government argued on appeal that, although the informant had asked the defendant questions, no sixth amendment violation occurred because the informant had disobeyed instructions. Id., 269–71. The Supreme Court rejected that argument, concluding that, because of the informant's history and proximity to the defendant, the officer "must have known that such propinquity likely would lead to that result." Id., 271. The court then recounted "the powerful psychological inducements" attendant to confinement: "[T]he mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover [g]overnment agents." Id., 274. On these grounds, the court concluded that the government had violated the defendant's constitutional rights by "intentionally creating a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel . . . ."[22] Id., 274.

Finally, in *Maine* v. *Moulton*, supra, 474 U.S. 159, a cooperating codefendant wore a wire to a meeting requested by the defendant. Id., 164. As in *Henry*, the informant was affirmatively instructed not to question the defendant. Id., 165. Notwithstanding that instruction, the informant prompted the defendant to make certain incriminating statements. Id., 166. Some of those statements were admitted at trial, and the defendant subsequently was convicted. Id., 167. Before examining the facts of the case before it, the court characterized the right at issue as follows: "Once the right to counsel has attached and been asserted, the [s]tate must of course honor it. This means more than simply that the [s]tate cannot prevent the accused from obtaining the assistance of counsel. The [s]ixth [a]mendment also imposes on the [s]tate an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the [s]tate's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel."[23] (Footnote omitted.) Id., 170–71.

In *Moulton*, the state advanced an argument on

appeal that the sixth amendment had not been violated because the meeting had been initiated by the defendant rather than by the state. Id., 174. The Supreme Court rejected that argument, concluding that the defendant had an affirmative right "to rely on counsel as a 'medium' between him and the [s]tate." Id., 176; see also id., 170–71 n.6. Thus, the court concluded that "knowing exploitation by the [s]tate of an opportunity to confront the accused without counsel being present is as much a breach of the [s]tate's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the [s]ixth [a]mendment is violated when the [s]tate obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." Id., 176. As it had in *Henry*, the court then held that this standard had been met, concluding that, in light of the undisputed facts, the state "must have known" that the informant would elicit incriminating statements. Id., 177.

Some general principles can be drawn from these Supreme Court cases. First, although the state's affirmative obligation primarily requires it to refrain from taking action, it does not follow that a court conducting a sixth amendment analysis must ignore opportunities for the state that came to pass by chance. Thus, the court found a constitutional violation in *United States* v. *Henry*, supra, 447 U.S. 268, even though the informant's housing in the same cellblock as the defendant in that case had not been prearranged by the government. The fact that the defendant requested the meeting in *Maine* v. *Moulton*, supra, 474 U.S. 174–76, likewise did not preclude a constitutional violation. Second, because of the pressures attendant to physical custody, the risk of infringement of the right to counsel is more acute in the jailhouse setting. See *United States* v. *Henry*, supra, 274. Third, a rule requiring direct proof that the government knowingly violated the defendant's right to counsel sets the bar too high to protect that right. See *Maine* v. *Moulton*, supra, 176 n.12; see also *State* v. *Diaz*, 302 Conn. 93, 120, 25 A.3d 594 (2011) (*Palmer, J.*, concurring) ("[I]t is difficult for a defendant to demonstrate the existence of an 'implicit understanding' between the state and an informer that the latter will, in fact, receive a benefit for his or her testimony. In fact, it is likely to be *impossible* for the defendant to demonstrate the existence of such an understanding between the state and its witness." (Emphasis in original.)). It will suffice to show that, in light of the totality of the circumstances, the state "must have known" that its actions likely would lead to the deliberate elicitation of incriminating statements.[24] *United States* v. *Henry*, supra, 271.

Although these United States Supreme Court cases explored the bounds of deliberate elicitation, lower courts examining the question of agency—including

this court—have frequently looked to those decisions for guidance. See, e.g., *State* v. *Alexander*, supra, 197 Conn. 184; see also *Ayers* v. *Hudson*, 623 F.3d 301, 310–16 (6th Cir. 2010) (applying "must have known" standard from *Henry* and invoking state's affirmative obligation from *Moulton* in case in which deliberate elicitation was conceded by governemnt); *Randolph* v. *People*, 380 F.3d 1133, 1144 (9th Cir. 2004) ("*Henry* makes clear that it is not the government's intent or overt acts that are important; rather, it is the 'likely . . . result' of the government's acts"); *Matteo* v. *Superintendent, SCI Albion*, 171 F.3d 877, 895 (3d Cir.) (applying intentional creation standard from *Henry* to question of agency), cert. denied sub nom. *Matteo* v. *Brennan*, 528 U.S. 824, 120 S. Ct. 73, 145 L. Ed. 2d 62 (1999); *United States* v. *Johnson*, 4 F.3d 904, 912 (10th Cir. 1993) (applying " 'affirmative obligation' " standard from *Moulton* to question of agency), cert. denied, 510 U.S. 1123, 114 S. Ct. 1082, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Carroll* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Nottingham* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994); *Depree* v. *Thomas*, 946 F.2d 784, 796 (11th Cir. 1991) (applying "must have known" standard from *Henry* to question of agency); *Thomas* v. *Cox*, 708 F.2d 132, 136 (4th Cir.) ("The point at which agency—hence proper attribution—for this purpose arises out of a government-citizen relationship is not subject to any bright-line test. But we think a general benchmark can be derived from *Henry*, [in which] the agency question did figure in the [c]ourt's factual analysis."), cert. denied, 464 U.S. 918, 104 S. Ct. 284, 78 L. Ed. 2d 262 (1983).[25]

The United States Supreme Court has yet to articulate a test for determining agency under *Massiah*. Other courts, however, have confronted that question directly. Decisions of this court, in particular, provide some initial instruction in this regard. "There is no [bright-line] test for determining when a private citizen is acting as an agent of the police." *State* v. *Alexander*, supra, 197 Conn. 183. "The existence of an agency relationship . . . turns upon a number of factual inquiries into the extent of police involvement with the informant. Those inquiries include the following: whether the police have promised the informant a reward for his cooperation or whether he is self-motivated . . . whether the police have asked the informant to obtain incriminating evidence and placed him in a position to receive it . . . and whether the information is secured as part of a government initiated, [preexisting] plan." (Internal quotation marks omitted.) *State* v. *Swinton*, supra, 268 Conn. 855–56; accord *State* v. *Marshall*, 882 N.W.2d 68, 91 (Iowa 2016) ("[I]t seems clear . . . that agency under *Massiah* does not rely too heavily on traditional principles of private contract or agency law, but instead seems closer to the doctrine of state action. The ques-

tion, for constitutional purposes, is whether the actions of an informant may be fairly attributed to the state."), cert. denied, U.S. , 137 S. Ct. 829, 197 L. Ed. 2d 68 (2017).

The facts underlying *State* v. *Swinton*, supra, 268 Conn. 781, serve as a useful starting point. In that case, a jailhouse informant, who previously had provided information to the police in unrelated cases, overheard the defendant making death threats against certain witnesses. Id., 852–53. The informant later met with the police, told them about the defendant's statements, and entered into a formal agreement with the state to serve as a " 'listening post.' " Id., 853. After the informant returned to prison, the defendant made further incriminating statements. Id. The trial court found that the nature of the informant's relationship had changed when he entered into a formal agreement with the police. Id., 853–54. Specifically, the trial court found that, before the meeting, there was "no evidence whatsoever that the police had instructed [the informant] to gather information about [the defendant's] case, about crimes in general, or about any other case in particular, nor [was] there any evidence that the police had indicated to [the informant] that he would be rewarded in any way by providing information . . . ." (Internal quotation marks omitted.) Id., 857. This court agreed, noting that, although the informant had assisted the police previously and "had some expectation that he would benefit from providing information . . . there was no evidence that the government had directed or steered the informant toward the defendant." Id., 858. Neither the trial court in that case nor this court, however, had any difficulty concluding that the informant was a government agent after entering into a formal agreement with the state.[26] Id., 859.

Cases from other jurisdictions help to draw the line between entrepreneur and agent more precisely. The United States Court of Appeals for the Second Circuit,[27] for example, has held that "[a]n informant becomes a government agent vis-à-vis a defendant when the informant is instructed by the police to get information about [that] particular defendant." (Internal quotation marks omitted.) *United States* v. *Whitten*, 610 F.3d 168, 193 (2d Cir. 2010); see also *United States* v. *LaBare*, 191 F.3d 60, 65 (1st Cir. 1999); *Moore* v. *United States*, 178 F.3d 994, 999 (8th Cir.), cert. denied, 528 U.S. 943, 120 S. Ct. 356, 145 L. Ed. 2d 278 (1999).[28]

Other courts have looked at the government's relationship with the informant more broadly and examined the record for, among other things,[29] evidence of promises or the provision of some benefit. See *Thompson* v. *Davis*, 916 F.3d 444, 455 (5th Cir. 2019) ("[t]o determine whether an informant was a government agent for purposes of a *Massiah* claim, the court asks whether the informant was promised, reasonably led to believe, or

actually received a benefit in exchange for soliciting information from the defendant . . . and whether he acted pursuant to instructions from the [s]tate, or otherwise submitted to the [s]tate's control"); *United States* v. *Johnson*, supra, 4 F.3d 910–11 (agency may be supported by express or implied quid pro quo); see also *Ayers* v. *Hudson*, supra, 623 F.3d 311 ("although direct written or oral instructions by the [s]tate to a jailhouse informant to obtain evidence from a defendant would be sufficient to demonstrate agency, it is not the only relevant factor"); *Depree* v. *Thomas*, supra, 946 F.2d 793–94 ("[t]here is, by necessity, no bright-line rule for determining whether an individual is a government agent for purposes of the sixth amendment right to counsel").

Courts have reached a general consensus that an agency relationship may be established through either implicit or explicit conduct. See *State* v. *Marshall*, supra, 882 N.W.2d 91 (citing cases). Indeed, requiring a defendant to produce admissible evidence of an explicit agreement, promise, or instruction as a predicate to relief would substantially diminish the protections afforded under *Massiah*. See *Ayers* v. *Hudson*, supra, 623 F.3d 312 ("[t]o hold otherwise would allow the [s]tate to accomplish 'with a wink and a nod' what it cannot do overtly"). Requiring proof of formal arrangements is also in tension with the affirmative obligation to protect a defendant's right to counsel imposed by the United States Supreme Court. See *Maine* v. *Moulton*, supra, 474 U.S. 171.

The trial court in the present case correctly determined that the record does not evince an express or formal agreement between Pladsen and Weaver. However, this is also not a case in which the state met with a jailhouse informant only *after* the incriminating statements had been elicited. See, e.g., *State* v. *Swinton*, supra, 268 Conn. 857. Accordingly, we must determine whether Pladsen's conduct after meeting with Weaver was, in light of all the facts presented, fairly attributable to the state. See *United States* v. *Henry*, supra, 447 U.S. 270; *State* v. *Marshall*, supra, 882 N.W.2d 91. Although the question is a close one in this case, we believe that, on balance, Pladsen's efforts to procure incriminating statements from the defendant during the course of the underlying trial were not the result of mere "luck or happenstance . . . ." *Maine* v. *Moulton*, supra, 474 U.S. 176. Rather, we conclude that those efforts are fairly attributable to the state.

First, the meeting between Pladsen and Weaver placed a significant emphasis on what useful information Pladsen might obtain as the result of his future assistance. Indeed, Pladsen did not convey any information of importance to Weaver during their initial meeting at Northern. Instead, the two discussed the possibility that Pladsen could elicit, and perhaps record, *addi-*

*tional* incriminating statements from the defendant at some later point in time. Although the state is correct to note that Weaver conditioned any formal plans on approval by the Office of the State's Attorney, the content of this particular conversation indicates, at the very least, that the prospect of such assistance would be considered.

Second, the meeting at Northern appears to have focused Pladsen's efforts on producing a particular type of evidence. Pladsen's letter to Weaver offered to provide information against the defendant but referenced only unrelated criminal charges.[30] During the meeting that followed, Weaver and Pladsen expressly discussed the defendant's involvement in the victim's death. Weaver asked Pladsen if he would be comfortable wearing a wire, plainly stated that the police were "always interested" in verifiable information from reliable sources, and then left Pladsen with his contact information. In this context, one could readily infer that the state was principally interested in objectively verifiable forms of evidence regarding the defendant's involvement in this particular case, such as a recording or writing. Although Weaver made no explicit requests during this meeting, the handwritten note that Pladsen ultimately produced during the state's case-in-chief mirrored those requirements precisely.[31]

Third, Pladsen clearly sought assurance from Weaver that a benefit would be made available in exchange for his cooperation. See footnote 11 of this opinion. Weaver said that he could not personally make any promises, but his response (1) informed Pladsen that the Office of the State's Attorney would have to approve any "deals," and (2) made Pladsen "generally aware" of the fact that "any information received" would be conveyed to the Office of the State's Attorney. Weaver said that he would be willing to listen to anything Pladsen had to say, and Pladsen said that he understood. Although Weaver did not connect these dots in explicit terms, the presence of such express language is not necessarily required for the reasons stated previously. See *State* v. *Arroyo*, 292 Conn. 558, 568, 973 A.2d 1254 (2009) ("the expectation of a [r]eward for testifying is a systemic reality . . . even where the informant has not received an explicit promise of a reward" (citation omitted; internal quotation marks omitted)), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010); see also *McBeath* v. *Commonwealth*, 244 S.W.3d 22, 33–34 (Ky. 2007) (there was some evidence that informant acted with expectation of future benefit when officer responded to informant's inquiry by stating " '[t]hat's up to the prosecutor' ").

The fact that the state did not object to Pladsen's attempt to pursue a modification of his twenty-five year sentence is also relevant.[32] As we noted previously, Pladsen's testimony indicates that this precise exchange was

discussed during his meeting with Weaver at Northern. Indeed, the state does not appear to contest that, as a factual matter, Pladsen ultimately was permitted to seek a sentence modification as the result of his assistance in the present case. Although Pladsen's efforts in that regard ultimately proved unsuccessful, the state's forbearance of its unilateral right to veto such a proceeding in its entirety pursuant to § 53a-39 (b) provided something objectively valuable in exchange for Pladsen's cooperation. Cf. *United States* v. *Brink*, 39 F.3d 419, 423 n.5 (3d Cir. 1994). In the sixth amendment context, the provision of such an actual benefit in exchange for an informant's cooperation serves as at least some evidence of agency. See *United States* v. *Johnson*, supra, 4 F.3d 910–11; *United States* v. *York*, 933 F.2d 1343, 1358 (7th Cir.) (overruled on other grounds by *Wilson* v. *Williams*, 182 F.3d 562 (7th Cir. 1999)), cert. denied, 502 U.S. 916, 112 S. Ct. 321, 116 L. Ed. 2d 262 (1991); *United States* v. *Surridge*, 687 F.2d 250, 254 (8th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct. 465, 74 L. Ed. 2d 614 (1982).

Finally, the sixth amendment concerns in the present case must be viewed in light of the defendant's confinement. As the United States Supreme Court has noted, "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover [g]overnment agents." *United States* v. *Henry*, supra, 447 U.S. 274; see *Matteo* v. *Superintendent, SCI Albion*, supra, 171 F.3d 895; see also *Illinois* v. *Perkins*, 496 U.S. 292, 307, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990) (Marshall, J., dissenting) ("Custody works to the [s]tate's advantage in obtaining incriminating information. The psychological pressures inherent in confinement increase the suspect's anxiety, making him likely to seek relief by talking with others."). In this context, "the government has long been on notice that the use of prison informants risks treading on the constitutional rights of an accused . . . ." *United States* v. *Stevens*, 83 F.3d 60, 65 (2d Cir.), cert. denied, 519 U.S. 902, 117 S. Ct. 255, 136 L. Ed. 2d 181 (1996).[33]

To summarize, Weaver met with Pladsen and expressed an interest in obtaining verifiable evidence of incriminating statements from this particular defendant regarding this particular case. Although there was no "agreement," "contract," "mutual understanding," or "meeting of the minds," the two expressly discussed Pladsen's desire for a benefit in exchange for his cooperation in the present case, and, in fact, the state actually provided such a benefit to Pladsen after the desired evidence was produced. Although the record does not evince any particular "plan" or "instruction," Weaver knew from the initial letter that Pladsen had strong incentives to cooperate as the result of his incarceration and consecutive sentences, had already gained the defendant's trust, and was in a uniquely strong position

to question the defendant at length. After Weaver told Pladsen that he was interested in hearing new evidence relating to the victim's death—by, for example, suggesting the use of a wire—additional control would have been superfluous. We conclude that the state either knew or should have known that such a conversation was likely to end in further deliberate elicitation.[34]

Notwithstanding the eventual likelihood of such efforts by Pladsen, very little was done to protect the defendant's sixth amendment rights. During the meeting at Northern, Weaver could have expressly instructed Pladsen to cease deliberately eliciting information from the defendant or to avoid conversations regarding the present case until the Office of the State's Attorney could provide guidance on how to proceed. Although the Office of the State's Attorney ultimately instructed Weaver not to pursue this avenue, that fact was never communicated to Pladsen. Weaver's general admonition that any plans or deals would have to be formally approved, the impact of which is unclear; see footnote 12 of this opinion; was "a far cry from the express and appropriate warnings" that should have been given. *State* v. *Howell*, Superior Court, judicial district of New Britain, Docket No. CR-05-222048-S (January 30, 2007) (*Sheldon*, *J.*).[35] On the basis of the record presently before us, we simply cannot conclude that the state has satisfied its affirmative obligation under *Massiah* and its progeny to respect and preserve the defendant's invocation of his constitutional right to counsel. See *Maine* v. *Moulton*, supra, 474 U.S. 171.

The trial court's remaining findings of historical fact do not alter this analysis. Although Pladsen was housed with the defendant by chance, that same fact was of no moment in *United States* v. *Henry*, supra, 447 U.S. 268. Likewise, the fact that Pladsen initiated contact with the police does not diminish the possibility that the state subsequently took advantage of the opportunity that contact created. See *Maine* v. *Moulton*, supra, 474 U.S. 176 ("knowing exploitation by the [s]tate of an opportunity to confront the accused without counsel being present is as much a breach of the [s]tate's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity"). Finally, although the defendant's subjective knowledge that Pladsen was speaking with Weaver may be relevant to an analysis of waiver; see *United States* v. *Henry*, supra, 273; the question of agency must be resolved by an examination of the facts relating to the nature of the relationship between the state and the defendant's interrogator.[36]

For the foregoing reasons, we conclude that a scrupulous examination of the undisputed facts contained within the record of the present case establishes that the defendant has satisfied his burden of demonstrating the existence of an agency relationship under *Massiah*.

The trial court's denial of the motion to suppress Pladsen's testimony was, therefore, improper. As a result, the defendant is entitled to a new trial.

## II

The defendant next claims that there is insufficient evidence that he had "remain[ed] unlawfully" in the victim's apartment, as required to sustain a conviction on the charge of burglary in the first degree under General Statutes (Rev. to 2001) § 53a-101 (a) (2).[37] The defendant's sole argument in support of this claim is that *State* v. *Allen*, 216 Conn. 367, 382, 579 A.2d 1066 (1990), should be overruled because it "impermissibly merges the [element] of remaining unlawfully and the intent to commit a crime" by holding that proof of any indoor criminal act satisfies both elements. The state agrees with the defendant's reading of *Allen* but nevertheless argues that its holding should be allowed to stand as settled law. We conclude, however, that the holding of that case stands for the far narrower proposition that the state may prove an unlawful remaining by producing evidence that a defendant has engaged in conduct that was likely to terrorize occupants. *State* v. *Allen*, supra, 382–84. For the reasons that follow, we decline the defendant's invitation to overrule that holding.

Although this claim is framed as a question of evidentiary sufficiency, the issue presented relates to the proper construction of this state's burglary statutes and, more particularly, the scope of the phrase "enters or remains unlawfully . . . ." General Statutes (Rev. to 2001) § 53a-101 (a). The question of whether our construction of that statutory language in *Allen* should be overruled raises an issue of law that is subject to plenary review. See, e.g., *State* v. *Salamon*, 287 Conn. 509, 529, 949 A.2d 1092 (2008); see also, e.g., *Spiotti* v. *Wolcott*, 326 Conn. 190, 195, 163 A.3d 46 (2017).

"The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Sullivan*, 285 Conn. 208, 216, 939 A.2d 541 (2008). "In evaluating the force of stare decisis, our case law dictates that we should be especially wary of overturning a decision that involves the construction of a statute. . . . When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do. Sometimes, when we have made such a determination, the legislature instructs us that we have misconstrued its intentions. We are bound by the instructions so provided. . . . More often, however, the legislature takes no further action to clarify its intentions. Time and again, we have characterized

the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute. . . . Once an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision." (Internal quotation marks omitted.) Id., 216–17.

We begin by setting forth the relevant statutory language. General Statutes (Rev. to 2001) § 53a-101 (a) (2) provides in relevant part that "[a] person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."[38] General Statutes (Rev. to 2001) § 53a-100 (b), in turn, provides that "[a] person 'enters or remains unlawfully' in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so."[39]

In *State* v. *Allen*, supra, 216 Conn. 379, this court considered whether there was sufficient evidence to support a conviction of burglary in the first degree. In addressing that claim, we began by noting that the phrase "licensed or privileged" was "meant as a unitary phrase, rather than as a reference to two separate concepts." (Internal quotation marks omitted.) Id., 380. Drawing from a previous Appellate Court decision, we explained: "A *license* in real property is defined as a personal, revocable, and unassignable *privilege*, conferred either by writing or parol, to do one or more acts on land without possessing any interest therein." (Emphasis in original; internal quotation marks omitted.) Id., quoting *State* v. *Grant*, 6 Conn. App. 24, 29, 502 A.2d 945 (1986).

In *Allen*, the evidence showed that the defendant had entered the subject premises, a condominium, with an accomplice who had a key. *State* v. *Allen*, supra, 216 Conn. 381. The defendant was then led upstairs where the occupant of the home was tied up, unclothed, and gagged. Id., 381–82. Although the victim looked to the defendant for assistance, none was given. Id. Instead, the defendant stole some of the victim's property and watched while his accomplice choked the victim. Id., 382. On the basis of these facts, this court rejected the defendant's claim that there was insufficient evidence of an unlawful remaining. Id. Specifically, we reasoned that, "even if the defendant initially entered the victim's condominium lawfully, it is clear that consent to remain was implicitly withdrawn and thus that the [defendant] unlawfully remained within the meaning of the statute." (Internal quotation marks omitted.) Id.

In *Allen*, this court distinguished *State* v. *Thomas*, 210 Conn. 199, 204, 554 A.2d 1048 (1989), a case that involved a convenience store robbery. We indicated that the holding of *Thomas*—namely, that "a defendant does not lose his status as a member of the public by manifesting a criminal intent"—was relevant only in cases in which the premises were held " 'open to the public' " and, therefore, did "not apply to a private dwelling that requires the continued consent of its occupant."[40] *State* v. *Allen*, supra, 216 Conn. 383–84. We then reiterated that the purpose of the statutory phrase "enters or remains unlawfully" is "to make clear that only the kind of entry or remaining [that] is likely to terrorize occupants is prohibited by the crime of burglary." (Internal quotation marks omitted.) Id., 384. In *Allen*, we readily concluded that "the element of terror was present" and that "seeing the victim naked, gagged, and tied up on the floor, and seeing [his accomplice] threaten, strike and choke the victim while the victim, in terror, looked for help, all clearly indicated to the defendant that, even if there were consent for his initially entering the condominium, it had been [implicitly] withdrawn." Id.

The defendant in the present case suggests that *Allen* "conflate[s] the elements of intent and unlawful remaining." Specifically, the defendant asserts that our reasoning in that case implies that "a person's license to be on the property is revoked simply because he commits a crime inside the premises . . . ." Put differently, the defendant claims that, under *Allen*, "every person who commits a crime while inside a building also commits a burglary . . . ." The defendant argues that, instead, this court should restrict unlawful remaining to surreptitious conduct.[41] In presenting these arguments, the defendant relies on case law from other jurisdictions, this state's plain meaning rule, as embodied in General Statutes § 1-2z, and various cannons of statutory construction.

Neither *Allen* nor its progeny, however, supports the defendant's interpretation of this court's reasoning. Indeed, that case was expressly dependent on the victim's sense of terror. Broadening the holding of that case to reach *any* indoor criminal act would not only dispense with that requirement but also with the need for any occupants at all. Although such facts are not always required for the commission of a burglary; compare General Statutes § 53a-102 (a) (occupancy is required for burglary in second degree) with General Statutes § 53a-101 (a) (3) (occupancy is not required for burglary in first degree); or for a finding of an unlawful remaining itself; see footnote 40 of this opinion; the fact that the defendant's presence was "likely to terrorize" the victim in *Allen* was indispensable to our conclusion that any existing license or privilege to remain had been implicitly revoked. (Internal quotation marks

omitted.) *State* v. *Allen*, supra, 216 Conn. 384.

This narrower reading of *Allen* is bolstered by the fact that the Appellate Court has consistently restricted its application to cases in which the state has presented evidence that the defendant engaged in conduct likely to terrorize occupants. See, e.g., *State* v. *Marsan*, 192 Conn. App. 49, 53–54, 56–61, 216 A.3d 818 (declining to extend *Allen* to case in which home aide stole from client's unoccupied home), cert. denied, 333 Conn. 939, 218 A.3d 1049 (2019); *State* v. *Bharrat*, 129 Conn. App. 1, 26–27, 20 A.3d 9 (implicit revocation of license or privilege to remain when defendant awoke victim by stabbing him to death with knife), cert. denied, 302 Conn. 905, 23 A.3d 1243 (2011); *State* v. *Morocho*, 93 Conn. App. 205, 219, 888 A.2d 164 ("whatever possible license the defendant thought he had to enter the victim's bedroom . . . that license was withdrawn when he refused to identify himself, charged toward the victim, lay on top of her and attempted to kiss and to touch her all over her body"), cert. denied, 277 Conn. 915, 895 A.2d 792 (2006); *State* v. *Brooks*, 88 Conn. App. 204, 208 n.2, 868 A.2d 778 ("[e]ven if the evidence could be construed to show an implicit consent to the defendant's entry into [the] apartment, [a] vicious assault . . . was clearly not within the scope of that consent"), cert. denied, 273 Conn. 933, 873 A.2d 1001 (2005); *State* v. *Gelormino*, 24 Conn. App. 563, 572, 590 A.2d 480 ("even if the evidence could be construed to show the victim's implicit consent to the defendant's entry, the vicious assault perpetrated on the victim was clearly not within the scope of that consent"), cert. denied, 219 Conn. 911, 593 A.2d 136 (1991); see also *State* v. *Stagnitta*, 74 Conn. App. 607, 615, 813 A.2d 1033 (although defendant's status as employee may have provided license or privilege to enter private office while restaurant was closed to public, "that privilege did not extend to entering the office displaying an eight to ten inch knife and demanding money"), cert. denied, 263 Conn. 902, 819 A.2d 838 (2003). The defendant has not cited, and our research has not discovered, any appellate authority extending the holding of *Allen* beyond this context.

The fact that our legislature has declined to express any disagreement with this line of cases over the course of nearly three decades counsels strongly against overruling *Allen* in favor of a more restrictive statutory interpretation. See, e.g., *Commission on Human Rights & Opportunities* v. *Sullivan*, supra, 285 Conn. 216–17. This is especially true because the legislature has made unrelated amendments to the relevant statutory scheme. See *Stuart* v. *Stuart*, 297 Conn. 26, 47, 996 A.2d 259 (2010) (argument in favor of "[l]egislative concurrence is particularly strong [when] the legislature makes unrelated amendments in the same statute" (internal quotation marks omitted)). Specifically, our legislature passed a series of comprehensive amendments to this state's

burglary statutes in 2008 that not only retained the phrase "enters or remains unlawfully" in § 53a-101 (a) and the existing statutory definition set forth in § 53a-100 (b), but also added several new instances of that exact same statutory phrase. Public Acts, Spec. Sess., January, 2008, No. 08-1, §§ 1, 2 and 4. We may presume that the legislature was aware of *Allen* and its progeny when doing so. See, e.g., *R.C. Equity Group, LLC* v. *Zoning Commission*, 285 Conn. 240, 257 n.20, 939 A.2d 1122 (2008).

The defendant's various arguments do not warrant the opposite result. The defendant, citing § 1-2z, encourages this court to abandon the existing line of cases and to begin the process of statutory construction anew. We decline to do so. See, e.g., *Kasica* v. *Columbia*, 309 Conn. 85, 93–94 and n.10, 70 A.3d 1 (2013) (in interpreting statutory text, this court is bound by our prior constructions of statute); *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 501, 923 A.2d 657 (2007) (enactment of § 1-2z did not overrule existing case law). Although an argument in favor of overruling established precedent may well be strengthened by tension with a statute's plain meaning, we can discern no such conflict in the present case. When a building is not open to the public, the relevant statutory inquiry turns on whether a defendant was "licensed or privileged" to remain. General Statutes (Rev. to 2001) § 53a-100 (b). The holding of *Allen*, which merely stated the standard for proving the absence of such a license or privilege in a particular factual setting, is facially consistent with that requirement. Finally, the defendant's argument that *Allen* results in statutory surplusage because it dispenses with the element of an unlawful entry or remaining is logically dependent on the premise that *any* indoor criminal conduct necessarily gives rise to an implicit revocation. Because, as we previously indicated, the holding in *Allen* extends only to conduct by a defendant that is "likely to terrorize occupants"; (internal quotation marks omitted) *State* v. *Allen*, supra, 216 Conn. 384; the distinct elements of the crime of burglary remain.

The defendant is correct that intermediate appellate courts in New York have declined to conclude that viop lent conduct gives rise to an implicit revocation of a defendant's license or privilege to remain. See *People* v. *Bowen*, 17 App. Div. 3d 1054, 1055, 794 N.Y.S.2d 203, appeal denied, 5 N.Y.3d 759, 834 N.E.2d 1264, 801 N.Y.S.2d 254 (2005); *People* v. *Konikov*, 160 App. Div. 2d 146, 152–53, 559 N.Y.S.2d 901, appeal denied, 76 N.Y.2d 941, 564 N.E.2d 680, 563 N.Y.S.2d 70 (1990). The conclusion reached in *Allen*, however, is consistent with the law in states other than New York. See *Davis* v. *State*, 737 So. 2d 480, 484 (Ala. 1999) ("[E]vidence of a struggle giving rise to the inference of an unlawful remaining is supplied by [the defendant's] choice to kill by a [less than instantaneous] technique of strangula-

tion and by his use of three nonfatal stab wounds to the victim's lower back. Based on the circumstances suggested by the evidence, the jury reasonably could have found that [the defendant], from the point at which he began committing his criminal acts, 'remain[ed] unlawfully' in [the victim's] home with the intent to commit a crime."); *Sparre* v. *State*, 164 So. 3d 1183, 1200–1201 (Fla.) (defendant's invitation to premises was "effectively rescinded" when victim began attempting futilely to defend herself from fatal attack), cert. denied, U.S. , 136 S. Ct. 411, 193 L. Ed. 2d 325 (2015); *State* v. *Walker*, 600 N.W.2d 606, 610 (Iowa 1999) (victim's begging and resistance to assault amounted to implicit revocation of defendant's license to remain). Notwithstanding common origins, modern burglary law often differs significantly between jurisdictions. See *Quarles* v. *United States*, U.S. , 139 S. Ct. 1872, 1879, 204 L. Ed. 2d 200 (2019). Such variations are, without more, generally insufficient to overcome the weighty considerations attendant to stare decisis.[42] See, e.g., *Graham* v. *Commissioner of Transportation*, 330 Conn. 400, 420, 195 A.3d 664 (2018).

In light of the foregoing, we decline the defendant's invitation to overrule *Allen* and its progeny. The defendant advances no argument on appeal that the conduct at issue in the present case was unlikely to terrorize the victim. As a result, the defendant's sufficiency of the evidence claim relating to the crime of burglary in the first degree must fail.

III

Finally, we address the defendant's claim of instructional error because we conclude that the issue of third-party culpability is likely to arise on remand. The defendant contends that a third-party culpability instruction was reasonably supported by the evidence relating to unidentified male DNA discovered on the victim's vaginal swab, her shoulder, and her bedroom doorframe. In response, the state argues that this evidence was insufficient to support such an instruction.[43] Specifically, the state argues that this evidence establishes only that "the victim may have socialized, done drugs, and had sex with various men in the days preceding her death" and, therefore, fails to establish a direct connection "between any particular third party and the crimes against the victim . . . ."

The following additional facts and procedural history are relevant to our discussion of this claim. Carll Ladd, the supervisor of the DNA section of the state forensic laboratory, testified at trial that a particular test had indicated that both the defendant and a second, unidentified male were contributors to DNA on the victim's vaginal swab.[44] Ladd also testified that the defendant was excluded as a contributor to certain unidentified male DNA in saliva discovered on the victim's shoulder.[45] Finally, Ladd testified that the defendant also was

excluded as a contributor to certain unidentified male DNA discovered at the location of a transfer bloodstain on the victim's bedroom doorframe.[46] Ladd testified that he did not know precisely when any of this male DNA was deposited.

The defendant's revised request to charge included the following proposed instruction regarding evidence of third-party involvement: "You are hereby instructed that a defendant may offer proof [that] indicates that a third party, and not the defendant, committed some of the acts for which the defendant is on trial. The defendant must, however, show some evidence which, if believed, tends to directly connect a third party to said acts. The primary object of the third-party suspect testimony is not to prove the guilt of the third party but to raise a reasonable doubt about the guilt of the defendant. In the present case, you have heard evidence concerning the presence of the DNA of a person or persons other than [the defendant] and [the victim] at the scene of the crime. If that evidence leaves you with a reasonable doubt as to [the defendant's] guilt, you must find him not guilty."[47]

The state objected to this proposed instruction at a charging conference held on June 12, 2007. In response, defense counsel asserted that such an instruction was warranted by "the forensics" proffered at trial, citing *State* v. *Cerreta*, 260 Conn. 251, 260–62, 796 A.2d 1176 (2002). After hearing arguments, the trial court concluded that the defendant had failed to establish entitlement to a third-party culpability instruction.

"In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge [that] is relevant to the issues of [a] case and [that] is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence." (Internal quotation marks omitted.) *State* v. *Schovanec*, 326 Conn. 310, 318–19, 163 A.3d 581 (2017). This court has previously stated that "the very standards governing the admissibility of [third-party] culpability evidence also should serve as the standards governing a trial court's decision of whether to submit a requested [third-party] culpability charge to the jury." *State* v. *Arroyo*, 284 Conn. 597, 608–609, 935 A.2d 975 (2007).

We note that, although *Arroyo* did not expressly state a particular standard of review for claims of instructional error related to third-party culpability, this court has previously reviewed such claims under an abuse of discretion standard. See *State* v. *Schovanec*, supra,

326 Conn. 320–23; *State* v. *Jackson*, 304 Conn. 383, 424, 40 A.3d 290 (2012); see also *State* v. *James*, 141 Conn. App. 124, 137, 60 A.3d 1011, cert. denied, 308 Conn. 932, 64 A.3d 331 (2013); cf. *State* v. *Ceballos*, 266 Conn. 364, 422, 832 A.2d 14 (2003) ("[w]e review a trial court's refusal to give a child credibility instruction for abuse of discretion because that instruction is not for the statement of any rule of law but for a cautionary comment upon the evidence" (internal quotation marks omitted)); *State* v. *Hines*, 243 Conn. 796, 816, 709 A.2d 522 (1998) ("[t]he decision whether to give an instruction on flight, as well as the content of such an instruction, if given, should be left to the sound discretion of the trial court").

The admissibility of third-party culpability evidence is generally "governed by the rules relating to relevancy. . . . Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . [E]vidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that [raises] only a bare suspicion that a third party, rather than the defendant, committed the charged offense [is not] relevant to the jury's determination." (Internal quotation marks omitted.) *State* v. *Schovanec*, supra, 326 Conn. 319; see also *State* v. *Baltas*, 311 Conn. 786, 810, 91 A.3d 384 (2014) ("in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated [that] [s]uch evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of [third-party] culpability" (internal quotation marks omitted)).

"[I]n some cases, the location of [physical] evidence at a particular crime scene will give rise to a reasonable inference that the evidence was left at the scene by a perpetrator of the crime, such as when the relationship between the evidence and crime scene is close and direct . . . ." (Citation omitted.) *State* v. *West*, 274 Conn. 605, 626–27, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005). This nexus, however, necessarily attenuates with distance. See id., 627 (concluding that evidence discovered "at the periphery of the crime scene" lacked probative value). A comparison of our decisions in *Cerreta* and *West* is illustrative of this principle.

In *State* v. *Cerreta*, supra, 260 Conn. 253, this court considered a claim that third-party culpability evidence was improperly excluded in violation of the defendant's right to present a defense under the sixth and fourteenth amendments to the United States constitution. The vic-

tim in that case, a seventy-four year old woman, died from asphyxia after being bound with a sock in her mouth. Id., 254. The defendant, who had been charged with murder, sought to introduce forensic evidence connected to the crime scene. Id., 253. Specifically, the defendant submitted evidence indicating that hairs found on both the victim's body and the ligatures used to bind her had not come from him. Id., 257–59. The defendant also sought to introduce evidence that fingerprints from a third party had been discovered on various personal effects strewn about the victim's body. Id., 254, 259. The trial court excluded these pieces of forensic evidence on relevancy grounds. Id., 259. On appeal, the defendant claimed that the proffered evidence should have been admitted because it "was relevant to the question of whether someone [else had] committed the crime . . . charged." Id. The state responded by arguing, among other things, that the forensic evidence stopped short of "conclusively exonerating the defendant"; id., 260; and was irrelevant "because it was impossible to determine exactly when the hair and fingerprints were left where the police discovered them." Id., 263.

This court agreed with the defendant, concluding that it could "discern no reasonable basis for concluding that the exculpatory evidence the defendant sought to introduce was irrelevant." Id., 262. Specifically, we held that "[e]vidence that a third party's hair and fingerprints were found at the crime scene [raised] more than a bare suspicion that someone other than the defendant may have committed the crime. Rather, the excluded evidence established a direct connection between the unidentified source of hair and fingerprints and the scene of the murder. Such evidence meets the threshold requirement that it directly connect a third party to the crime."[48] Id., 263. We then rejected the state's arguments to the contrary: "The hair and fingerprints were recovered not from the periphery of the crime scene but from the victim's body, the ligatures used to bind her hands and feet, and the personal effects on and around her body. This evidence was central to the only contested issue at trial: the identity of the perpetrator. Although it may be the case that this evidence would not have exonerated the defendant unequivocally, such is not the standard for relevance. All that must be shown is that the evidence tends to support the conclusion for which it is offered, even if it does so only to a slight degree." Id.

By contrast, in *State* v. *West*, supra, 274 Conn. 610, this court concluded that the trial court did not abuse its discretion by excluding certain forensic evidence recovered from a crime scene. The defendant in that case, who was charged with murder, sought to introduce evidence eliminating her as the source of unidentified latent prints discovered in the victim's home on a second floor bathroom door and on the doorjamb of a

first floor bedroom. Id., 609, 623. The defendant claimed "that the unidentified . . . [prints were] relevant, and therefore admissible, because that evidence established that a person or persons other than the defendant were present in those areas of [the] home where the intruder had gone after entering . . . namely, the second floor and the first floor master bedroom." Id., 626. We rejected that argument, concluding that the prints could have been "made weeks, months or even years before" the crimes at issue. Id. We noted that, although the location of such evidence can "give rise to a reasonable inference that the evidence was left at the scene by a perpetrator . . . when the relationship between the evidence and crime scene is close and direct," the prints at issue in that case "were located at the periphery of the crime scene, where . . . they may have been left by any number of invitees . . . ." Id., 626–27. We remarked that, "[b]ecause the nexus between the prints and the crime scene [was] so attenuated, and because there [were] so many likely explanations for the prints aside from the mere possibility that they were left by an unidentified perpetrator, the evidence of the prints [was] lacking in probative value."[49] Id., 627. Accordingly, this court concluded that the trial court did not abuse its discretion by excluding the unidentified prints that the defendant had sought to admit. Id.

The evidence forming the basis of the defendant's request for a third-party culpability instruction in the present case was, of course, admitted into evidence and placed before the jury.[50] The trial court's initial decision to admit that evidence does not, however, necessarily compel the issuance of a third-party culpability instruction as a matter of law.[51] "Whether a defendant has sufficiently established a direct connection between a third party and the crime with which the defendant has been charged is necessarily a fact intensive inquiry." *State* v. *Baltas*, supra, 311 Conn. 811. A trial court must make that decision on the basis of the totality of the evidence actually admitted at trial. See *State* v. *Marshall*, 114 Conn. App. 178, 187, 969 A.2d 202 (noting fluid nature of trials), cert. denied, 292 Conn. 911, 973 A.2d 661 (2009).

In order to determine whether the evidence actually admitted during the course of the defendant's trial would have supported a third-party culpability instruction, we look to the context surrounding it and the guiding principles set forth in *Cerreta* and *West*. See *State* v. *Arroyo*, supra, 284 Conn. 608–609. It cannot be said that two of the DNA samples found on the victim's body—namely, the samples from her vaginal swab and from the saliva on her shoulder—were recovered from the periphery of the crime scene. Like the hair in *Cerreta*, that evidence was recovered directly from the victim's body. It is important to note that *context*, and not proximity alone, is necessary to establish a direct connection between forensic evidence and a third party to the crime.

In the present case, for example, Ladd gave a "general estimate" that the unidentified male DNA found on the victim's vaginal swab could have lasted for up to three days. Given this longer time frame, the unidentified male DNA on the victim's vaginal swab, in and of itself, would have been insufficient to require a third-party culpability instruction as a matter of law. The male DNA on the victim's shoulder, however, would have existed for a more limited duration and was not otherwise explained by the record. Finally, the unidentified male DNA on the doorframe of the victim's bedroom was recovered from a location that was, undisputedly, covered in the victim's blood during the commission of the crimes charged. That fact readily distinguishes it from the prints on the doorjamb in *West*.

The state argues that the evidence of the unidentified male DNA discovered at the crime scene was wholly irrelevant because "there was no evidence as to when any of that DNA had been deposited or to whom it belonged." The fact that both the source of the DNA and the exact time that it was deposited remained unknown does not, however, require a conclusion that the evidence was irrelevant. Indeed, this court readily concluded that the evidence at issue in *Cerreta* was admissible, notwithstanding the absence of proof regarding those same facts. See *State* v. *Cerreta*, supra, 260 Conn. 263 ("The state took the position . . . that the excluded evidence was unreliable, and therefore irrelevant, because it was impossible to determine exactly when the hair and fingerprints were left where the police discovered them. We find no merit in this argument.").

Viewing all of the evidence contained in the record in the light most favorable to supporting the proposed charge; see, e.g., *State* v. *Schovanec*, supra, 326 Conn. 318; we conclude that the defendant satisfied the threshold requirement of establishing a direct connection between at least some of the unidentified male DNA discovered in the victim's apartment and the various crimes alleged. Because the DNA on the victim's shoulder and the bedroom doorframe would have reasonably supported an instruction on third-party culpability, we conclude that the trial court abused its discretion by declining to provide such an instruction to the jury.[52]

The judgment is reversed and the case is remanded for a new trial.

In this opinion PALMER, McDONALD, D'AURIA, KAHN and ECKER, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, McDonald, D'Auria, Mullins, Kahn and Ecker. Although Justice Palmer was not present when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

** August 6, 2020, the date that this decision was released as a slip opinion,

is the operative date for all substantive and procedural purposes.

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (4).

[2] The defendant has raised more than two dozen additional claims on appeal. These claims relate to, inter alia, isolated evidentiary rulings, the posttrial discovery of evidence, and certain inadvertent mistakes or omissions. Still other claims arise from various tactical decisions. In light of the information contained in the record and the positions adopted by the parties in their briefs, we are unable to conclude that such claims are likely to arise on remand. Accordingly, we decline to review those claims in the present appeal.

[3] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e; see also, e.g., *State* v. *Weatherspoon*, 332 Conn. 531, 536 n.3, 212 A.3d 208 (2019).

[4] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] The defendant's statement indicated that the victim had attacked him in the kitchen with a knife. The defendant stated that the resulting struggle moved to the bedroom and that the victim had eventually asked, "[w]hat do you want sex?" The defendant allegedly said yes and then had unprotected sex with the victim. The defendant stated that, after they were done, the victim attacked him again with the knife. The defendant stated that he then stabbed the victim, that she stopped moving, and that he left her face down on the bed. After a police officer noted that there was no mention of strangulation, the defendant amended his statement to include the fact that he had used his hands to get the victim to stop making noise.

Several factual discrepancies between this account and the physical evidence discovered at the crime scene were noted at trial and, indeed, remain contested in the present appeal. The extent to which the defendant's memory may have been impaired by drug use, both on the night of the victim's death and during his interrogation, also remains disputed.

[6] General Statutes (Rev. to 2001) § 53a-54b (5) and (6) proscribe, respectively, murder during the course of a kidnapping and murder during the course of sexual assault in the first degree. Because the defendant was charged with these capital offenses, the guilt and penalty phases of the trial were bifurcated pursuant to General Statutes (Rev. to 2001) § 53a-46a, as amended by Public Acts 2001, No. 01-151, §§ 1 and 2.

[7] Although the defendant was originally sentenced to death on the capital felony counts, he was subsequently resentenced to a term of life imprisonment without the possibility of release on those charges. See, e.g., *State* v. *Peeler*, 321 Conn. 375, 377, 140 A.3d 811 (2016); *State* v. *Santiago*, 318 Conn. 1, 85–86, 122 A.3d 1 (2015).

[8] A defendant's right to counsel under the sixth amendment is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *State* v. *Leconte*, 320 Conn. 500, 505 n.2, 131 A.3d 1132 (2016).

[9] The record indicates that Pladsen and the defendant occupied cells close to one another and typically participated in recreation outside of the presence of other inmates.

[10] Although the state's brief appears to contest whether Weaver made an affirmative request, the trial court's factual findings, Pladsen's testimony, and the state's own arguments at trial indicate, at the very least, that the topic of using a wire was broached by Weaver.

[11] Pladsen testified that he had specifically asked Weaver about the possibility of receiving a sentence modification. Weaver testified that Pladsen did not expressly mention what kind of benefit he was seeking.

[12] The record contains conflicting indications regarding the impact of Weaver's statement. For example, Pladsen testified that, during this meeting, he had told Weaver that he "would try" to get more information from the defendant and that Weaver had not dissuaded him from doing so. Pladsen also testified that he continued his general "effort to obtain information from [the defendant]" after the meeting with Weaver. On another occasion, Pladsen testified: "I remember telling [Weaver that] I don't mind going back trying to get some more information in the meantime, and I remember him saying, well just let me run it by the . . . state's attorney first and let's see [how] this wire pans out, and he never got back to me." Finally, Pladsen testified that his decision to ask the defendant to write a note was a "spur of the moment type of thing . . . ." In light of these discrepancies, we are unable to agree with the assertion of the concurring and dissenting justice

that the record contains "[no] evidence that Pladsen ever informed Weaver that he intended to obtain information from the defendant." Pladsen's testimony on this point was simply inconsistent.

[13] In light of the messages both into and out of Northern, we respectfully disagree with the contention of the concurring and dissenting justice that "Weaver never communicated directly with Pladsen" in the months following their meeting at Northern.

[14] Pladsen also testified that the defendant became angry later that day about the fact that the note had been given to the prosecution. Pladsen testified that he had told the defendant that the note must have been discovered in the trash and that the defendant had then asked him to claim authorship.

[15] The trial court file contains an incorrect notation by the clerk indicating that the defendant's motion to suppress Pladsen's testimony was granted.

[16] Pladsen also recounted the defendant's reaction to the state's discovery of the note and the conversation that followed. See footnote 14 of this opinion.

[17] Following the defendant's conviction, the trial court held an evidentiary hearing pursuant to *State* v. *Floyd*, 253 Conn. 700, 732, 756 A.2d 799 (2000), in order to explore whether the state had, yet failed to disclose, an agreement with Pladsen at the time of trial, in violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). During that hearing, the lead prosecutor at the defendant's trial, Senior Assistant State's Attorney John Fahey, testified that he had made no deals with Pladsen at the time of trial and that they had not discussed the possibility of a sentence modification. Fahey testified that he had promised Pladsen only that he would, "if ever requested, as a commissioner of the Superior Court, make known to a judge [the] good, bad and indifferent . . . ."

Two other witnesses testified at that hearing about the interactions between Fahey and Pladsen. The first of those witnesses, a corrections officer who had been assaulted by Pladsen, Karen Stratton White, testified that Fahey had visited her in 2015 to discuss modification of the twenty-five year sentence that had resulted from that assault. White testified that, during that discussion, she received the impression that Fahey wanted her "to go along with Pladsen having [a sentence modification] hearing" and that Fahey had "given his word" because Pladsen "had helped him with that other case." The second witness, Pladsen's mother, Judy Yvonne Pladsen, testified that she had spoken with Fahey at the time of the defendant's trial and that he had "guaranteed" her that the court would modify her son's sentence in exchange for providing testimony against the defendant. In rejecting the defendant's *Brady* claim, however, the trial court expressly declined to credit the testimony of these two witnesses, stating that "[n]either was in a position to either confirm or deny the existence of any agreement."

[18] Records of that proceeding are the proper subject of judicial notice. See, e.g., *Shirley P.* v. *Norman P.*, 329 Conn. 648, 660, 189 A.3d 89 (2018).

[19] We note that this approach is consistent with the standard of review applied to the agency prong of *Massiah* by the majority of the federal courts of appeals. See, e.g., *United States* v. *Ocean*, 904 F.3d 25, 33 (1st Cir. 2018) ("We review the trial judge's findings of fact for clear error . . . . We review de novo [the] constitutional conclusion based on the facts as the trial judge found them." (Citation omitted.)), cert. denied sub nom. *Mitchell* v. *United States*, U.S. , 139 S. Ct. 931, 202 L. Ed. 2d 656 (2019), and cert. denied, U.S. , 139 S. Ct. 1362, 203 L. Ed. 2d 596 (2019); *United States* v. *Birbal*, 113 F.3d 342, 345 (2d Cir.) ("review[ing] the [D]istrict [C]ourt's conclusions as to constitutional violations de novo, and its findings of fact for clear error"), cert. denied, 522 U.S. 976, 118 S. Ct. 433, 139 L. Ed. 2d 333 (1997); *United States* v. *O'Dell*, Docket No. 95-1069, 1995 WL 765231, *3 (7th Cir. December 27, 1995) (decision without published opinion, 73 F.3d 364 (7th Cir. 1995)) ("we conclude as a matter of law that [the informant] acted as a government agent when he spoke to [the defendant]"); *United States* v. *Brink*, 39 F.3d 419, 421 (3d Cir. 1994) ("[w]e apply plenary review to the [D]istrict [C]ourt's application of legal precepts . . . and clearly erroneous review to its factual findings" (citation omitted)); *United States* v. *Johnson*, 4 F.3d 904, 910 (10th Cir. 1993) (reviewing District Court's conclusion on agency "under the clearly erroneous standard with respect to the underlying factual issues but de novo with respect to the ultimate constitutional issue"), cert. denied, 510 U.S. 1123, 114 S. Ct. 1082, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Carroll* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Nottingham* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994);

*United States* v. *Surridge*, 687 F.2d 250, 252 (8th Cir.) ("Some courts have called the determination of whether a person is a government informant or agent a factual determination. . . . We agree that the determination as to the relationship or understanding between the police and the informant is a factual determination. However, beyond this factual determination there is a legal question: whether the relationship or understanding as found by the [D]istrict [C]ourt is such that the informant's questioning has to be considered government interrogation for constitutional examination." (Citations omitted; footnote omitted.)), cert. denied, 459 U.S. 1044, 103 S. Ct. 465, 74 L. Ed. 2d 614 (1982). But see *United States* v. *Li*, 55 F.3d 325, 328 (7th Cir. 1995); *United States* v. *Malik*, 680 F.2d 1162, 1165 (7th Cir. 1982); *United States* v. *Van Scoy*, 654 F.2d 257, 261 (3d Cir.), cert. denied, 454 U.S. 1126, 102 S. Ct. 977, 71 L. Ed. 2d 114 (1981).

The concurring and dissenting justice contends that this court's observation in *State* v. *Alexander*, supra, 197 Conn. 185, that agency is "primarily a question of fact" compels the application of the substantial evidence standard of review to the trial court's ultimate conclusion on the question of agency. This court, however, also has characterized the deliberate elicitation prong in a similar manner. See *State* v. *Swinton*, supra, 268 Conn. 856 ("[t]he second issue of fact is whether [the informant] 'deliberately elicited' the defendant's statements"). Cases from the United States Supreme Court leave little room for doubt that questions of law abound in that context. In *United States* v. *Henry*, 447 U.S. 264, 268–69, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), for example, the court did not even mention, much less afford deference to, the trial court's ultimate conclusion on the question of deliberate elicitation.

[20] The concurring and dissenting justice concludes that this precept is irrelevant to the question of agency under *Massiah* because that precise issue was not disputed in *Moulton*. See footnote 9 of the concurring and dissenting opinion. We, however, agree with those federal courts of appeals that read this language as a broader, guiding principle in this unique constitutional context and, accordingly, decline to cabin its import to cases examining deliberate elicitation. See *Ayers* v. *Hudson*, 623 F.3d 301, 316 (6th Cir. 2010); *United States* v. *Johnson*, 4 F.3d 904, 912 (10th Cir. 1993), cert. denied, 510 U.S. 1123, 114 S. Ct. 1082, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Carroll* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994), and cert. denied sub nom. *Nottingham* v. *United States*, 510 U.S. 1123, 114 S. Ct. 1081, 127 L. Ed. 2d 398 (1994).

[21] In reaching this conclusion, the United States Supreme Court rejected an argument that the statements should be admissible because the police were merely fulfilling their duty to continue an investigation. *Massiah* v. *United States*, supra, 377 U.S. 206. Although the court recognized that such continuing investigations may be proper, it nonetheless concluded that the defendant's own incriminating statements "could not constitutionally be used by the prosecution as evidence against *him* at his trial." (Emphasis in original.) Id., 207.

[22] Justice Blackmun authored a vigorous dissent asserting that the majority effectively had ignored the fact that the informant had been explicitly instructed *not* to ask any questions and that, by using phrases such as " 'must have known' " and " 'likely,' " the majority had "fundamentally restructure[d]" *Massiah* to include even " 'negligent' " elicitation. *United States* v. *Henry*, supra, 447 U.S. 278–80 (Blackmun, J., dissenting).

[23] Indeed, the court asked, "what use is a defendant's right to effective counsel at every stage of a criminal case if, while he is held awaiting trial, he can be questioned in the absence of counsel until he confesses?" (Internal quotation marks omitted.) *Maine* v. *Moulton*, supra, 474 U.S. 171, quoting *Spano* v. *New York*, 360 U.S. 315, 326, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959) (Douglas, J., concurring).

[24] We agree with the concurring and dissenting justice that the state's foreknowledge of deliberate elicitation is alone insufficient to give rise to an agency relationship. Simply put, such a test could result in a constitutional violation without any state action. See *State* v. *Marshall*, 882 N.W.2d 68, 91 (Iowa 2016), cert. denied,      U.S.     , 137 S. Ct. 829, 197 L. Ed. 2d 68 (2017). We emphasize that some action by the state is always required in this context; the question of whether such actions suffice to create an agency relationship, in turn, must be determined by examining whether, in light of the surrounding context, the state must have known that its own conduct was likely to result in an infringement of the defendant's sixth amendment right to counsel. See *Ayers* v. *Hudson*, 623 F.3d 301, 311 (6th Cir. 2010) ("[i]t is not the government's intent or overt acts that are important; rather,

it is the likely . . . result of the government's acts" (internal quotation marks omitted)). In cases in which the state chooses to act, its affirmative obligation requires it to do so in a manner that "respect[s] and preserve[s] the accused's choice to seek [the] assistance [of counsel]." *Maine* v. *Moulton*, supra, 474 U.S. 171.

[25] The concurring and dissenting justice's reliance on *Cox* to support the proposition that *Henry* is irrelevant to the question of agency is, therefore, inapt. It is also worth noting that, although the concurring and dissenting justice is correct that a case from the United States Court of Appeals for the Fifth Circuit has declined to adopt language from *Henry* as governing the question of agency, the precise passage that court declined to engraft looks very similar to the test proposed by the concurring and dissenting justice. See *Creel* v. *Johnson*, 162 F.3d 385, 393 (5th Cir.1998) ("[C]iting to [*Henry*], [the defendant] argues that we should consider whether [the informant] 'was charged with the task of obtaining information from an accused.' *Henry* involved . . . a clear case of agency, and the [c]ourt only considered if the agent [was] 'charged with the task of obtaining information from an accused' to determine whether the agent 'deliberately elicited' the information. [The defendant's argument fails because] the agency inquiry is precedent to and distinct from determining whether an agent 'deliberately elicits' information.").

[26] In *State* v. *Swinton*, supra, 268 Conn. 855, we cited a previous decision of this court, *State* v. *Alexander*, supra, 197 Conn. 185, for the applicable legal standard governing the question of agency. In *Alexander*, this court concluded that there was substantial evidence to support the trial court's factual finding that an agency relationship was absent when the police drove a private citizen who lacked a driver's license to meet with the defendant in jail on two occasions. Id., 186–87. Although our decision in that case noted some level of facilitation and encouragement by the police; id.; the informant in that case was not incarcerated, and there was no evidence that he actually received anything in exchange for his cooperation. Id., 187 and n.4. Finally, we note that our decision in *Alexander* predated the United States Supreme Court's pronouncement that, under *Massiah*, the "police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine* v. *Moulton*, supra, 474 U.S. 171. In light of these distinctions, our decision in *Alexander* is of limited utility in the present case.

A Superior Court case, *State* v. *Howell*, Superior Court, judicial district of New Britain, Docket No. CR-05-222048-S (January 30, 2007) (*Sheldon, J.*), contains a more instructive set of facts. In that case, the defendant was arrested, charged with murder, and held in lieu of bond. Id. The informant in that case, a fellow inmate, began interacting with the defendant in the prison recreation area. Id. During a series of conversations there, the defendant remarked that his charges related to the disappearance of a prostitute and made certain incriminating statements. Id. The informant subsequently called the police to discuss the defendant, and a detective asked, in particular, if the defendant had said anything about the body. Id. The informant responded that, although the defendant had not said anything yet, the conversations would likely " 'lead up to that.' " Id. The detective affirmatively instructed the informant not to press the defendant for information but also implied that the informant should continue listening, stating: "[I]f [the defendant's] offering shit you know just." Id. The informant then returned to the recreation area and elicited further incriminating statements from the defendant. Id.

The detective spoke to the informant again the following day. "This conversation began with a lengthy lecture by the [d]etective to [the informant] about the legal consequences of his continuing cooperation with the investigation in light of the fact that the defendant was formally charged with murder and had an attorney appointed to represent him. According to the [d]etective, [the informant] had become an agent of the [s]tate with respect to the police investigation of [the] death and disappearance [of the victim] when they first spoke on the telephone the day before. Thus, the [d]etective told him, he could not ask the defendant any questions on the subject of [the victim] . . . and he could not agree with the defendant, or even nod his head, if the defendant ever spoke about her." (Citation omitted.) Id. At trial, the state sought to admit the incriminating statements made by the defendant both before and after the informant's first contact with the police. Id.

The trial court in that case concluded that, notwithstanding certain evidence indicating that the informant had provided information to the police

regarding certain other cases, there was no evidence of an agency relationship before the first telephone call. Id. The trial court also found, however, that an agency relationship had been established when, "upon completing his short phone call . . . [with] the [d]etective . . . and learning that the [d]etective was very interested in what the defendant might ultimately tell him, [the informant] returned to the recreation area to hear whatever else the defendant was ready to say." Id. The trial court opined that the detective's admonition not to " 'press' " the defendant was "a far cry from the express and appropriate warnings" given the following day and that the informant's actions after the first telephone call amounted to deliberate elicitation. Id. Accordingly, the trial court in that case suppressed the evidence regarding the statements made by the defendant after the informant's first contact with the police. Id.

[27] Because this issue relates to a question arising under the federal constitution, case law from the Second Circuit is entitled to significant weight. See, e.g., *Gleason* v. *Smolinski*, 319 Conn. 394, 444 n.41, 125 A.3d 920 (2015).

[28] Although this approach has been described as a bright-line rule requiring government instruction as a predicate to relief under *Massiah*; see D. Kirsch, Note, "The Prosecutor Circumvents the Sixth Amendment Right to Counsel with a Simple 'Wink and Nod,' " 69 Mo. L. Rev. 553, 560–61 (2004); its origins may be traced back to cases weighing various factors. See, e.g., *United States* v. *Birbal*, 113 F.3d 342, 346 (2d Cir.), cert. denied, 522 U.S. 976, 118 S. Ct. 433, 139 L. Ed. 2d 333 (1997); *Stano* v. *Butterworth*, 51 F.3d 942, 977 (11th Cir. 1995), cert. denied sub nom. *Stano* v. *Singletary*, 516 U.S. 1122, 116 S. Ct. 932, 133 L. Ed. 2d 859 (1996); *Brooks* v. *Kincheloe*, 848 F.2d 940, 944–45 (9th Cir. 1988).

[29] For largely pragmatic reasons, courts have often hesitated to articulate an exhaustive list of factors in this context. See, e.g., *People* v. *Cardona*, 41 N.Y.2d 333, 335, 360 N.E.2d 1306, 392 N.Y.S.2d 606 (1977) ("we decline to subscribe to any ironclad rules as to when agency exists since the niceties of rule-complying form could easily mask the substance of a true agency relationship").

[30] The concurring and dissenting justice contests this reading. See footnote 22 of the concurring and dissenting opinion. This letter, which was marked as an exhibit for identification purposes, provides in relevant part: "I have some information that could be very useful to you and one of your cases. . . . I know all about Nashon and Valentino and so on. . . . You want my help, come [and] see me [and] we'll talk. . . ." Nashon and Valentino are individuals related to a different criminal case then pending against the defendant. Indeed, as the trial court in the present case itself noted, "the initial letter was not about [the victim]; [Pladsen] wanted to give information about [the defendant's] other crimes."

[31] Although it is not entirely clear from the record whether Pladsen expressly indicated that he would be continuing his efforts to obtain information from the defendant; see footnote 12 of this opinion; that fact would have become apparent to the state no later than May 29, 2007, the day the note was given to Weaver. Pladsen's testimony at trial indicates that, notwithstanding this fact, the defendant was returned to Northern later that same day where he made *additional* incriminating statements to Pladsen. Specifically, Pladsen testified at trial that the defendant was upset that the state had found the note and had asked him to claim authorship. See footnotes 14 and 16 of this opinion.

[32] We note that the record contains some evidence indicating that the state had expressly agreed to permit a sentence modification shortly before Pladsen testified in the present case. See footnote 17 of this opinion. The trial court, however, declined to find that evidence to be credible in ruling on a related postjudgment claim.

[33] The concurring and dissenting justice concludes that the defendant's incarceration "is simply not relevant to the question of whether Pladsen was an agent of the state." We recognize that a circuit split exists on this particular point of law and that, as a result, the position of the concurring and dissenting justice is supported by relevant case law. Compare *Matteo* v. *Superintendent, SCI Albion*, supra, 171 F.3d 895 (concluding that, "[c]ertainly, the 'special pressures' of custody were present"), with *United States* v. *Watson*, 894 F.2d 1345, 1347 (D.C. Cir. 1990) ("it is of no moment that the incriminating conversations took place while the accused was incarcerated"). Nonetheless, we disagree. The circumstances attendant to the defendant's incarceration, such as the undisputed fact that he recreated alone with Pladsen, must be considered when evaluating the "likely . . . result of the government's acts." (Internal quotation marks omitted.) *Ayers* v.

*Hudson*, supra, 623 F.3d 311. As a result, we find the reasoning of the United States Court of Appeals for the Third Circuit in *Matteo*, on balance, more persuasive.

[34] Even if Pladsen's initial private meeting with Weaver did not result in agency, surely, such a relationship would have been established after Pladsen offered, and the state affirmatively accepted, evidence specifically relating to the defendant's involvement in the victim's death. It is undisputed, however, that Pladsen was returned to Northern after producing the note, had another conversation with the defendant about the present case, and was subsequently called by the state to testify as to that conversation. See footnotes 14, 16 and 31 of this opinion. Because the state has conceded both deliberate elicitation and harmless error in the present appeal, this fact alone would have been sufficient to warrant reversal of the defendant's conviction.

[35] Although the presence of such prophylactic steps does not necessarily preclude sixth amendment infirmity; *Maine* v. *Moulton*, supra, 474 U.S. 165; *United States* v. *Henry*, supra, 447 U.S. 266–67; the state's failure to employ these measures in the present case undoubtedly increased the likelihood of infringement of the defendant's constitutional rights.

[36] To conclude otherwise would allow jailhouse informants to exclude themselves from consideration as a state actor simply by pretending to be a double agent. The fact that a defendant who falls victim to such a ruse may himself be seeking to gain some measure of unfair advantage is irrelevant. The state's affirmative obligation to avoid infringement of the right to counsel precludes such gamesmanship. See *Maine* v. *Moulton*, supra, 474 U.S. 171.

[37] We address this claim because it seeks relief in the form of a judgment of acquittal. See, e.g., *State* v. *Padua*, 273 Conn. 138, 178–79, 869 A.2d 192 (2005).

[38] Although the operative information charged the defendant with both unlawfully entering and remaining, the state's evidence and arguments pertain solely to the latter. See *State* v. *Belton*, 190 Conn. 496, 500, 461 A.2d 973 (1983) ("[t]o enter unlawfully contemplates an entry [that] is accomplished unlawfully, [whereas] to remain unlawfully contemplates an initial legal entry [that] becomes unlawful at the time that the actor's right, privilege or license to remain is extinguished"). Indeed, the state's brief notes that, at trial, it proceeded under the theory "that, because the victim was acquainted with the defendant and because there were no signs of forced entry, [the victim] likely willingly permitted [the defendant] to enter her apartment."

[39] The trial court gave the following instructions to the jury with respect to this element: "[T]he state must prove beyond a reasonable doubt that the defendant entered unlawfully or, regardless of how the defendant entered, he remained there unlawfully. A person enters or remains unlawfully in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the defendant is not otherwise licensed or privileged to do so. It does not matter how an intruder may actually have entered; if he did so without license, he has entered unlawfully. Even if a person entered a building lawfully, that is, he had the right or had been given permission and the right had been terminated or the permission withdrawn by someone who had a right to terminate or withdraw it, you may find unlawfully remaining as the basis of burglary."

[40] In *Thomas*, the state argued that the jury could have inferred an unlawful remaining from the fact that the defendant had "manifested an intent to carry out a criminal purpose" while inside of the convenience store. *State* v. *Thomas*, supra, 210 Conn. 207. In rejecting that argument, this court relied on a comment by the Commission to Revise the Criminal Statutes, which provides in relevant part: " 'The purpose of this definition is to make clear that only the kind of entry or remaining which is likely to terrorize occupants is prohibited by the crime of burglary. Thus, when the building is, at the time, open to the public, or the actor is otherwise licensed or privileged to be there, *the element of terror* is missing and the requirement is not met.' " (Emphasis added.) Id., quoting Commission to Revise the Criminal Statutes, Penal Code Comments, Connecticut General Statutes (1969) pp. 52–53, reprinted in Conn. Gen. Stat. Ann. § 53a-100 (West 2012), commission comment, p. 16.

[41] The paradigm of such an unlawful remaining occurs when a defendant enters a business when it is open to the public and then stays past closing. See *State* v. *Allen*, supra, 216 Conn. 384 ("A enters an office building during business hours—a lawful entry since the building is open to the public— and remains, perhaps hidden, after the building is closed, with intent to

steal. A is guilty of burglary." (Internal quotation marks omitted.)).

[42] The defendant relies on *State* v. *Clark*, 48 Conn. App. 812, 713 A.2d 834, cert. denied, 245 Conn. 921, 717 A.2d 238 (1998), as an example of the absurd results that would occur in the absence of a bright-line rule requiring surreptitious conduct. In that case, the victim was sexually assaulted in her own kitchen by an uninvited assailant. Id., 814, 824. The defendant argues that, "[i]f the conduct [at issue in *Clark*] had occurred outdoors, [the defendant in that case] would not have been guilty of the class B felony of burglary, but only of the class D felony of third degree sexual assault. Clearly the legislature did not intend for there to be such a disparity in the sentence a person could receive simply because the crime was committed indoors as opposed to outdoors."

It is, however, well established that such intrusions into the home cause a unique form of injury that has traditionally been punished as a separate and distinct offense under the law of this state. See, e.g., *State* v. *Little*, 194 Conn. 665, 675–76, 485 A.2d 913 (1984). In the absence of constitutional infirmity, concerns regarding the penalty affixed by statute to the crime of burglary are appropriately addressed to the legislature. See, e.g., *Washington* v. *Commissioner of Correction*, 287 Conn. 792, 828, 950 A.2d 1220 (2008) (acknowledging "the legislature's authority to define crimes and [set] appropriate penalties").

[43] We note that the state also contends that any error in this regard was harmless and that the parties disagree on the burden of proof attendant to such an analysis. See *State* v. *Arroyo*, 284 Conn. 597, 614, 935 A.2d 975 (2007) (declining to consider whether constitutional or nonconstitutional standard of harmless error review applies to improper omission of third-party culpability instruction). Because we address this claim as an issue likely to arise on remand, we need not address questions of harmless error in the present appeal.

[44] Although testimony offered at trial indicated that the victim had unprotected vaginal intercourse with a particular man the night before her death, no evidence was introduced to demonstrate that that man was the source of the unknown male DNA on victim's vaginal swab.

[45] Ladd indicated that this saliva came from a different source than other male DNA found on a condom from the victim's bedroom. In light of certain posttrial evidence linking the condom to another man; see footnote 44 of this opinion; it is reasonable to deduce that neither that man nor the defendant was the source of the male DNA discovered on the victim's shoulder. We note that, although both the state and the defendant make the same inference in briefing various issues in the present appeal, this information was not available to the trial court when it instructed the jury.

[46] With respect to this sample, Ladd testified that the victim was a major contributor and that the unidentified male was a minor contributor.

[47] We note that the current revision of the model criminal jury instructions contains similar language. See Connecticut Criminal Jury Instructions 2.6-10, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited August 5, 2020).

[48] In reaching this conclusion, this court noted: "The restrictions placed on [third-party] culpability evidence are concerned primarily with reliability and, in essence, seek to ensure that a defendant does not introduce tenuous evidence of [third-party] culpability in an attempt to divert from himself the evidence of guilt. . . . Those same concerns do not exist . . . where the evidence the defendant [seeks] to introduce [is] reliable, physical evidence that had undergone the rigors of forensic analysis." (Citations omitted.) *State* v. *Cerreta*, supra, 260 Conn. 262, citing *State* v. *Hernandez*, 224 Conn. 196, 202, 618 A.2d 494 (1992) (evidence of threat by third party), and *State* v. *Echols*, 203 Conn. 385, 392–94, 524 A.2d 1143 (1987) (evidence that third-party lookalike committed similar crime in same vicinity).

[49] This evidence stood in contrast to an unidentified print lifted from a gasoline filled soda bottle that had been used in the commission of the underlying crime that, we noted, had been properly admitted during the course of the underlying trial. *State* v. *West*, supra, 274 Conn. 616, 627 n.29.

[50] We note that the trial court "is in the best position to view the evidence in the context of the entire case and has wide discretion in making its evidentiary rulings." *State* v. *Schovanec*, supra, 326 Conn. 320; see also *State* v. *Walsh*, 67 Conn. App. 776, 790, 789 A.2d 1031, cert. denied, 260 Conn. 906, 795 A.2d 546 (2002). Like the decision of whether to give a third-party culpability instruction, a trial court's decision as to the admissibility of "[third-party] inculpatory evidence will be reversed on appeal only if the court has abused its discretion or an injustice appears to have been done."

(Internal quotation marks omitted.) *State* v. *West*, supra, 274 Conn. 626.

[51] For example, a trial court that exercises its discretion to admit forensic evidence demonstrating the presence of a third party at a crime scene nonetheless may act within its discretion by declining to give a third-party culpability instruction in the event the evidence actually admitted at trial falls short of proving a direct connection. Put differently, the fact that the trial court's predicate evidentiary rulings may have benefited the defendant does not compel the conclusion that its ultimate decision to withhold an instruction was error. Cf. *State* v. *Schovanec*, supra, 326 Conn. 316–17, 323.

[52] We emphasize that the question of whether the evidence actually admitted in any new trial will reasonably support a third-party culpability instruction must be vested, in the first instance, to the sound discretion of the trial court. See, e.g., *State* v. *Jackson*, supra, 304 Conn. 424.

————————————————